IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


MARIE-JOSEE CEROL,                    :
              Plaintiff,              :     CIVIL ACTION
                                      :
        v.                            :
                                      :
TEMPLE UNIVERSITY OF THE              :
COMMONWEALTH SYSTEM OF HIGHER         :
EDUCATION,                            :
              Defendant               :     NO. 06-213


<u>MEMORANDUM AND ORDER</u>

McLaughlin, J.                              August 16, 2007


        The plaintiff, an associate professor at Temple

University, alleges that she was denied a promotion to full

professor in retaliation for filing a charge with the EEOC.  The

defendant has filed a motion for summary judgment, which the

Court will grant.


I.  <u>Facts</u>

        The plaintiff (known professionally as "Ama Mazama")

was hired as an assistant professor in the defendant's Department

of African-American Studies ("DAAS") in 1993, recruited by

professor Molefi Asante.  Pl. Dep. at 32.[1]  She was granted

tenure in 1996.

_____

        [1]  A portion of the plaintiff's deposition is attached to
the Defendant's Brief in Support as Exhibit A and cited herein as
"Pl. Dep. at ___."

The plaintiff sued the university and her union in 1999, alleging that the selection of Joyce Joyce as department chair by Dean Carolyn Adams violated the professors' union agreement.  See Def.'s Br. in Supp. Ex. B, Ex. 4.  The suit was dismissed as moot when Dr. Joyce stepped down from the post.  See id. Ex. B, Ex. 5.

In September of 2002, the plaintiff filed a charge with the EEOC alleging that she was denied merit increases because of her national origin (the plaintiff is a French citizen from Guadeloupe).  She claimed that a letter placed in her file by Acting Dean Morris Vogel, which alleged that she contravened a directive from DAAS chair Nathaniel Norment, was also motivated by national origin discrimination.  Id. Ex. B, Ex. 17.

Acting Dean Vogel was replaced by Dean Susan Herbst ("Dean Herbst" or "the Dean") in May of 2003.  On May 27, 2003, the plaintiff received a "dismissal and notice of rights" letter from the EEOC.  The notice was sent to Virginia Flick of the defendant's Office of University Counsel.  Pl.'s Br. in Opp. Ex. D.  On June 3, 2003, the notice was faxed to Acting Dean Vogel. Id.  It is not clear who received the fax.  The plaintiff did not file a lawsuit based on her EEOC charge.


A.   Temple's Promotion Process

In the spring of 2003, the plaintiff decided to apply

2

for promotion to full professor.  At Temple, application for a full professorship, unlike an application for tenure, is not made at a fixed time.  Instead, promotion depends "only on [an applicant's] record of accomplishment."  Applicants for promotion are evaluated on their scholarship, teaching, and service to the university.  Def.'s Br. in Supp. Ex. B, Ex. 9 at 5, 8-9.   A candidate must excel in one area and be satisfactory in the other two in order to receive a promotion.  Id. Ex. B, Ex. 10 at 7.

In evaluating the scholarship of a candidate for full professor, work that was submitted in an application for tenure is not considered.  Scholarship is evaluated along the following criteria: (1) "site of publication (quality of the press and or journals)"; (2) "external reviews," including "solicited and unsolicited reports (e.g., book reviews...)"; and (3) "quality evaluation made by peers."  In reviewing published works, refereed or reviewed publications are given greater weight, and candidates are instructed to submit with their applications the review process for refereed materials.  To aid in the assessment of their scholarship, applicants and their departments select four external evaluators to judge the applicants' work.  The evaluators should not have a "strong personal connection" with the applicant -- they should not, for example, be "collaborators, mentors, or colleagues. . . [.]"  Id. Ex. B, Ex. 9 at 2, 5, 10.

The promotion process begins with the candidate's

nomination to the Dean by either the departmental chairperson, a full professor in the candidate's department, or the candidate himself or herself.  Id. at 12.  The process is tiered, with reviews by: (1) a committee within the candidate's department; (2) the department chair; (3) a committee of the college; (4) the dean; (5) a subcommittee of the Council of Deans where there are conflicting reviews; (6) the provost; and (7) the university president.  Each set of reviewers makes a recommendation as to whether the applicant should be promoted and then passes the file along to the next set of reviewers.

The departmental committee ordinarily consists of three full professors from the applicant's department.  Where the department has fewer than three full professors, the dean and the department together establish a committee to initiate the review process.  Id.

After the departmental committee review, the chair of the department makes an "independent recommendation."  The applicant's file is then passed along to the College Review Committee ("the College Committee" or "the Committee"), which consists of six members serving staggered, three-year terms.  The Dean is a "non-voting, ex-officio" member of the committee, which reviews the departmental recommendations but does not make a de novo assessment.  When the Committee discovers gaps in an applicant's file, it may request from the candidate additional

4

materials.  Id. at 13-14.

        The Committee's recommendation is forwarded to the
dean.  The dean makes an independent recommendation and transmits
the review to the Council of Deans when there are conflicting
recommendations on whether to grant a promotion.  Id. at 15-16.
The Council issues its own recommendation to the provost.   At
the time of the plaintiff's application, files were reviewed by
the Promotion and Tenure Advisory Committee when they were
received in the provost's office.  The Advisory Committee
consisted of full professors, university officers, and two
students.  The Advisory Committee made recommendations to the
provost, who then evaluated the applications himself.  Def.'s Br.
in Supp. Ex. N at 12-13.  The provost makes an oral or brief,
written recommendation to the president.  Pl.'s Br. in Opp. Ex. N
at 11-12.  The president then makes the final decision on whether
a candidate should be promoted.  Def.'s Br. in Supp. Ex. B, Ex 9
at 14, 16.


        B.  The Plaintiff Pursues Promotion

        On April 8, 2003, the plaintiff notified Acting Dean
Vogel that she intended to seek a promotion to full professor.
On June 10, 2003, Dean Herbst held a meeting with the plaintiff
to discuss her file.  According to the Dean, she frequently meets
with candidates for promotion to "discuss with them their record

and whether it's a good time for them to go up [for review] or
not. . . [.]"  Def.'s Br. in Supp. Ex. D at 16.

The two had, according to the plaintiff, a "decent
conversation."  The Dean told the plaintiff that she did not
think the plaintiff was ready to apply for a full professorship.[2]
She said that certain materials on the plaintiff's resume, such
as edited (as opposed to authored) books should not be given much
weight.  Pl. Dep. at 189, 192.  Dean Herbst testified, and the
plaintiff does not contest, that the Dean expressed concern with
the plaintiff's lack of articles in peer-reviewed journals and
books with known publishers.  Def.'s Br. in Supp. Ex. D. at 17-
18.

The plaintiff told the Dean that she thought that these
standards were too high relative to Temple's reputation and the
qualifications of other full professors.  Pl. Dep. at 190, 192.
She recognized, however, that these standards were set by the
university president and were increased "across the board."  Id.
at 189-99.

The plaintiff decided to pursue a promotion, telling
the Dean that it would be good for her "to get the information
[she] needed to make [her] case stronger. . . [.]"  Id. at 191-

---

[2]     The Dean met with two other applicants during the
summer of 2003 and advised both of them to postpone the promotion
process, which they did.  Pl.'s Br. in Opp. Ex. A at 2.  One of
these applicants was Nathaniel Norment, chair of the DAAS.  Pl.
Dep. at 30-31; Def.'s Br. in Supp. Ex. H at 20-21.

92.  (Professors may reapply for a promotion if they are
rejected.)

The DAAS has only one full professor, Molefi Asante,
and pursuant to the university's policies, he and the Dean
discussed the formation of an Ad Hoc committee to review the
plaintiff's file in lieu of the departmental committee.  Dean
Herbst suggested that Dr. Asante recuse himself from the
committee because of his relationship with the plaintiff.  (He
is, according to the plaintiff, her "mentor," and the two are co-
editors of the Encyclopedia of Black Studies and the Journal of
Black Studies.  Pl. Dep. at 32; Def.'s Br. in Supp. Ex. B, Ex. 6)
The Dean testified that it is common to ask professors to recuse
themselves in such situations because the fellow professor has "a
vested interest in the review going well because it reflects upon
their own work."  Id. Ex. D at 25.

After Dr. Asante assured the Dean that he could be
objective, the Ad Hoc committee was formed, consisting of Dr.
Asante and two professors from outside the DAAS.  The committee
solicited reviews from four external evaluators, who gave
positive assessments of the plaintiff's candidacy.  Pl.'s Br. in
Opp. Exs. G-J.  The Ad Hoc committee recommended that the
plaintiff be promoted, finding her research "excellent" and her
teaching and service "satisfactory."  The recommendation was
signed by Dr. Asante, who testified that a candidate's entire

body of work should be considered when evaluating an application for full professorship.  Def.'s Br. in Supp. Ex. H at 105; id. Ex. B, Ex. 22.

     C.   The College Committee Recommends Denial

        Although the next step in the review process is ordinarily an assessment by the department chair, Dean Herbst notified Dr. Norment that he should not review the plaintiff's file because he was not a full professor.  The Ad Hoc committee's review was therefore passed on to the College Committee.  At the time, Joyce Joyce, the subject of the plaintiff's 1999 lawsuit, was on the Committee.  She recused herself because she was the former chair of the DAAS.  Id. Ex. K at 33.

        According to Jack Goldkamp, the Committee member with primary responsibility for the plaintiff's file, the Committee lacked sufficient information to make a determination about the plaintiff's scholarship because of several deficiencies: her two sole-authored books since her last promotion were in French, and she did not provide translations or reviews of the works or information about their publishers.  She also failed to give "journal impact statements" or citation information so that the Committee could assess her articles.  The Committee wrote to Dean Herbst to ask whether it was appropriate to request these materials from the plaintiff, and the Dean responded that it was.

Id. Ex. O at 34-37.

Dean Herbst emailed the plaintiff on December 1, 2003 stating that the Committee requested translations of the works in French, information about the quality of the publishers, and book reviews.  She further stated that if these materials were not provided, the Committee would reach a decision on her application without the information.  She suggested that the plaintiff withdraw her application until the materials could be provided. Pl.'s Br. in Opp. Ex. L.

On December 5, 2003, after the plaintiff wrote to the Committee regarding its requests, one Committee member wrote to the others, "[d]o we know exactly what the Dean said to her?  Are we or are we not supposed to communicate with her directly?"  Id.

The Committee wrote directly to the plaintiff on December 8, 2003, repeating the requests for translations of the works in French, information about the publishers, and book reviews, commentaries, citations or "other scholarly feedback." It also requested "additional, independent outside review letters" from scholars associated with leading doctoral programs in African-American Studies.  In particular, it requested a review from an expert in linguistics, the topic of one of the plaintiff's books.  The Committee requested the materials by December 19, 2003 and stated that it might be "more realistic" to provide the materials for the next year's promotion cycle.  The

9

plaintiff replied on December 12, 2003, saying that the Committee should exclude from consideration her French works if it felt that it was "morally correct" and "legally sound."  She declined to withdraw her application.  Def's Br. in Supp. Ex. P, Exs. 2, 7.

The Committee issued its report on January 8, 2004, stating that it did not have enough information to assess the plaintiff's scholarship because she did not provide reviews, citation information, or publisher information for the works in French.  It stated that these requirements apply equally to professors whose works are in English.  Id. Ex. P, Ex. 8.  Dr. Goldkamp testified that he did not know about the plaintiff's EEOC charge when the Committee voted to recommend denial of her application.  Id. Ex. O at 105.

D.  The Dean Recommends Denial

After the College Committee issued its recommendation, the plaintiff's file was passed to Dean Herbst for review.  Her recommendation, in the form of a letter to Provost Schwartz, agreed with the Committee that the plaintiff should not be promoted.  She wrote that she must "go farther" than the Committee because she felt that the plaintiff's work was "far below" the university's "standard for promotion to the highest faculty rank."  She raised numerous critiques about the

plaintiff's work: (1) the works published in French and English were by unknown or unremarkable publishers; (2) it was impossible to assess the plaintiff's books because they were in French and she did not provide reviews; (3) there was a lack of peer-reviewed articles; (4) her articles in the <u>Journal of Black Studies</u>, of which she was an editor, did not contain "original research, critique, or theorizing"; and (5) the external evaluations were full of "wild praise without useful analysis of [the plaintiff's] research."  Pl.'s Br. in Opp. Ex. A at 1-4.

The Dean next examined the plaintiff's teaching, which she found satisfactory, and her service, which she found unsatisfactory.  She stated that the plaintiff's personnel file was "replete with complaints by and about" her and that she was a "chronic destructive force" in the DAAS and "at war with our College and University," as a conversation with Dr. Norment or her colleagues would confirm.  She added that the plaintiff's communications with her were "juvenile and mean spirited" and that the plaintiff "detests her own community and is intent on holding the Department back."  Finally, she cited an article by the plaintiff in the <u>Encyclopedia of Black Studies</u> in which she "demean[s] Temple and its administration" in a "childish and historically inaccurate characterization of department history."  <u>Id.</u> at 6.

The Dean testified that she did not know about the

plaintiff's EEOC charge when she wrote her recommendation. Def.'s Br. in Supp. Ex. D at 110.  The plaintiff maintains that this is false, relying in part on a comment Dr. Asante allegedly made to the Dean.

According to Dr. Asante, he had a conversation with the Dean on May 27, 2003 where she asked him whether the plaintiff was the woman "who brought the lawsuit against Temple."  He replied, "do you mean the EEOC?"  Id. Ex. H at 21.  They did not have an "extensive" conversation about the EEOC charge, according to Dr. Asante: "there was no discussion per se about it.  It was a comment."  Pl.'s Br. in Opp. Ex. C at 114, 118 (calling the mention of the EEOC charge a "passing reference").  Further, Dr. Asante misunderstood the nature of the plaintiff's EEOC charge, believing that it alleged retaliation based on the plaintiff's 1999 lawsuit as opposed to her claims of national origin discrimination.  Id. at 115.

The plaintiff also argues that the Dean's knowledge of the EEOC charge may be inferred from the notice of dismissal sent to Acting Dean Vogel and the fact that the notice was in the copy of the plaintiff's personnel file reviewed during discovery.  The defendant disputes that Dean Herbst received the fax addressed to Dean Vogel and points out that at the time the Dean reviewed the plaintiff's file in May of 2004, each professor had three files containing different material: one in the vice provost's office,

one in the human resources department, and one in his or her
department.  The files were not merged until June of 2004, after
the Dean's review.  Def.'s Br. in Supp. Ex. R.

    E.   <u>Dr. Norment Recommends Denial</u>

      After the Dean wrote her recommendation, she passed the
plaintiff's file to a subcommittee of the Council of Deans
because there were conflicting recommendations below.  Linda
Mauro, the Vice Provost for Faculty Affairs, reviewed the file
that was to be sent to the Council and asked Dean Herbst to
request a recommendation from the DAAS chair, Dr. Norment.  <u>Id.</u>
Ex. D at 74; Ex. I at 17-18.  Dr. Mauro felt that Dr. Norment's
recommendation was required by their union contract.  <u>Id.</u> Ex. S
at 29-30.

      Dr. Norment's recommended that the plaintiff be denied
a promotion.  Although he found her scholarship satisfactory, he
noted that: (1) she did not have any single-authored texts in
English; (2) the majority of her single-authored journal articles
appeared in the <u>Journal of Black Studies</u>, on whose editorial
board she served; and (3) she did not have an external review
from a professor of linguistics, her area of expertise.  He also
found her teaching satisfactory, despite unexplained episodes,
such as an alleged one-and-a-half-week absence from class.  His
negative recommendation rested on his conclusion that her service

was not satisfactory:

> ". . .during my tenure as chair, [the plaintiff] has
> not shown herself to be a colleague serving the best
> interests of the Department of African American
> Studies.  She has consistently worked against virtually
> any and all suggestions, initiatives, and efforts
> undertaken by the faculty (save Dr. Molefi Asante) in
> all departmental matters, irrespective of their level
> of significance.  It is my belief that she views
> herself as separate and distinct from the mission,
> methodology, and philosophical foundation of the
> department, does not actively participate in
> departmental functions or events, and practices a form
> of intellectual isolationism which threatens the
> advancement of the department and discipline in every
> area."

He also faulted the plaintiff for her Encyclopedia of Black

Studies entry about the history of the DAAS, calling it

"egregiously inaccurate."  Id. Ex. J, Ex. 1.  At the time he

wrote his review, Dr. Norment knew of the plaintiff's 1999

lawsuit but not her 2002 EEOC charge.  Id. Ex. I at 34, 39-40.

Dr. Norment's review was not considered by the Provost

or the President.  After Dr. Norment notified the plaintiff of

his review, she filed a petition to have his recommendation

removed from her file on the ground that he was only an associate

professor.  Deborah Hartnett, Vice President of Human Resources,

responded that although the collective bargaining agreement

between the professors' union and the university required a

recommendation from the departmental chair, the requirement would

be waived in the plaintiff's case and Dr. Norment's assessment

removed from her file.  Id. Ex. B, Ex. 27.

F.   <u>The Council of Deans Recommends Denial</u>

While Dr. Norment was writing his review, a subcommittee of the Council of Deans, consisting of the dean of the School of the Arts as well as the deans of the Social Administration, Dentistry, and Business schools, evaluated the plaintiff's file.  The Council limited itself to an assessment of the plaintiff's scholarship, concluding that it could not make an assessment for several reasons: (1) neither it nor the external reviewers could assess the impact of her books because they were published just prior to her application for promotion; (2) the plaintiff did not publish sufficient work in peer-reviewed journals; and (3) several of the external reviewers contributed to books edited by the plaintiff, raising the possibility of bias.  The Council recommended that the plaintiff resubmit her application at a later time.  <u>Id.</u> Ex. M, Ex. 1.

The conclusions of the Council were echoed in the deposition of Larry Icard, the chair of the Council, who noted the lack of book reviews in the plaintiff's file and the absence of materials enabling the Council to ascertain the value of the the her work in her field.[3]  He also testified that he did not know

---

[3]     Dr. Icard further testified that it was not uncommon to have a request made to have excerpts or chapters translated so that Council members could review the material; that no negative inference was drawn about the lack of English translation of the plaintiff's books; and that a translation would not have changed his recommendation because there still would have been no evidence of scholarly impact.  <u>Id.</u> at 22, 53-55.

about the plaintiff's EEOC charge when he reviewed her file.  Id.
Ex. L at 24, 34-35.


G.   The Plaintiff's Application is Denied

After a review by the Council, the plaintiff's file was
sent to Provost Ira Scwhartz for an informal review.  The
Advisory Committee recommended against promotion, and Provost
Schwartz agreed after making an "independent decision" on the
plaintiff's file.  He testified that the lack of English
translations or reviews of her work made evaluation of her
scholarship impossible.  He thought that the scholarship that
could be evaluated was "quite weak."  He did not see the
plaintiff's personnel file or know about her EEOC charge before
he made his recommendation.  Id. Ex. N at 26, 33, 36-38.

Finally, the plaintiff's file was passed to Temple's
President, David Adamany, who had a professor, Ann Van Sant,
assess her application.  Van Sant found the plaintiff's
scholarship lacking.  She noted that the plaintiff's only sole-
authored books were in French and that she did not provide
reviews for them.  Summing up the plaintiff's application, she
wrote:

> This is a disappointment at best.  Critical information
> is missing within the CV.  There is no complete listing
> of her teaching assignments and one wonders if all
> course evals were provided.  Syllabi are not strong.
> She has been a prolific writer, but the quality is
> unknown.  No reviews are provided.  The impact of her

work is not clearly established.  Finally, the external
evaluators do not provide rigorous reviews.  It appears
they may have been hand picked by Asante. . . [.]

Id. Ex. G, Ex. 1.  When the President reviewed the plaintiff's
file, he considered Dean Herbst's letter, but it was "in no way
determinative"; university policy required that he make an
"independent review."  He explained that this was necessary
"because in life, it's possible for everybody to be wrong but one
person."  Id. Ex. F at 42, 44.

In the President's view, it was "very unusual" for Dr.
Asante to sit on the Ad Hoc committee as the plaintiff's co-
author and co-editor.  He testified that he had rarely
encountered a similar situation and that he thought it reflected
a lack of "distance and objectivity" in the evaluation.
Assessing the plaintiff's scholarship, he observed that there was
a lack a citations to her work and that there was no way to
assess her books because she had not provided any reviews.  Id.
at 39-41.

On June 24, 2004, the President informed the plaintiff
that her application for promotion had been denied because the
impact of her scholarship could not be determined.  Id. Ex. G,
Ex. 3.  Both at the time of his evaluation of her file and at the
time of his deposition, the President was unaware of any EEOC
charge brought by the plaintiff.  Id. Ex. F at 45.

17

II.  Analysis

        The plaintiff alleges that her application for full
professorship was denied in retaliation for her EEOC charge in
violation of Title VII and the Pennsylvania Human Relations Act
("PHRA").[4]  She claims that the university's proffered reasons
for its decision were pretextual.  Pl.'s Br. in Opp. at 1.

        A "pretext" claim of unlawful retaliation under Title
VII follows the burden-shifting framework established in
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[5]  See
Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).
Under this framework, a plaintiff must first establish a prima
facie case of retaliation.  Id.  If the plaintiff succeeds, the
burden shifts to the defendant to "articulate some legitimate,
nondiscriminatory reason" for its actions.  Id. at 920 n.2.
Should the defendant carry this burden, the plaintiff must
convince the factfinder that this explanation was a pretext and
that retaliation was the real reason for the adverse employment
action.  Marra v. Philadelphia Housing Authority, --F.3d--, 2007
WL 2215603 at *9 (3d Cir. 2007)(quotation omitted).  The Court

────────────────

        [4]     The plaintiff's complaint also alleged that the denial
was motivated by her national origin in violation of Title VII
and the PHRA.  She has agreed to dismiss these claims.  Pl.'s Br.
in Opp. n.2.

        [5]     The same standards and decisional law apply to
retaliation claims under Title VII and the PHRA.  Slagle v.
County of Clarion, 435 F.3d 262, 265 & n.5 (3d Cir. 2006).

concludes that the plaintiff has failed to provide sufficient evidence to establish a prima facie case or permit an inference that the defendant's explanation for its actions was pretextual.

A.   The Plaintiff's Prima Facie Case

In order to establish a prima facie case of unlawful retaliation, a plaintiff must show: (1) that she engaged in a protected activity; (2) that she subsequently suffered an adverse employment action; and (3) that there was a causal connection between her protected activity and the employer's adverse action. Id. (citation omitted).

The parties agree that the plaintiff's EEOC charge was a "protected activity" and that the denial of promotion to full professor was an "adverse employment action."  The sole question, therefore, is whether the plaintiff has produced sufficient evidence to show a causal connection between the two.

A plaintiff may rely on a broad array of evidence to demonstrate this causal link.  The temporal proximity between the protected activity and the adverse action can be evidence of causation.  When the time between the protected activity and the alleged retaliation is not so close as to suggest causation by itself, courts look to the intervening period for "demonstrative proof."  Such evidence may take the form of antagonistic conduct or animus against the employee, inconsistent reasons given by the

employer for its actions, or the employer's treatment of other
employees.  Id. at *10.  In assessing whether the evidence
offered by the employee is sufficient to show causation, a court
should not view events in isolation but rather examine the "whole
picture" created by the facts.  Woodson, 109 F.3d at 921.

The plaintiff does not argue that the President's
ultimate decision to deny her a promotion was retaliatory.
Instead, she claims that Dean Herbst's recommendation was
retaliatory and tainted the subsequent reviews of her file.
Pl.'s Br. in Opp. at 2, 13-16.  The Court therefore first
examines whether the plaintiff has provided any evidence that the
Dean's recommendation was causally linked to her EEOC charge.

The Court assumes that the plaintiff's evidence would
allow a reasonable jury to find that Dean Herbst knew that the
plaintiff filed the charge,[6] but knowledge of protected activity

---

[6]    The evidence that Dean Herbst knew that the plaintiff
filed an EEOC charge when she reviewed the plaintiff's file is
weak.  The plaintiff has not discredited the defendant's
contention that there were three personnel files with different
materials at the time of Dean Herbst's review, and it is not
clear who received the June 3, 2003 fax to Acting Dean Vogel.
Nonetheless, a jury might find that the evidence, viewed in the
light most favorable to the plaintiff, establishes that Dean
Herbst knew that the plaintiff had filed a charge.

There is no evidence, however, that Dean Herbst knew
about the substance of the charge, which was filed eight months
before she was hired.  Dr. Asante did not testify that he
discussed the details of the charge with her, and in fact, he
mistakenly believed the charge related to the plaintiff's 1999
suit.  Further, the plaintiff's personnel file post-consolidation
and the fax sent to Acting Dean Vogel contained only the notice

by itself is insufficient to show causation.  See Woodson v. Scott Paper Co., 109 F.3d at 923 n.6.  See also Moore v. City of Philadelphia, 461 F.3d 331, 351 (3d Cir. 2006)(where employee sought to demonstrate causation based on temporal proximity between protected activity and adverse action, he needed to show in addition that the decisionmaker had knowledge of the protected activity).  The plaintiff must therefore point to other evidence of causation.  The plaintiff does not rely on a temporal link between her EEOC charge and the Dean's recommendation, but instead argues that the Dean's role in the promotion process and her recommendation itself provide sufficient evidence from which an inference of causation can be drawn.

### 1) The Dean's Role in the Promotion Process

The Court, as required by Woodson, evaluates the plaintiff's evidence by looking at the "whole picture."  The plaintiff described her initial meeting with Dean Herbst, which occurred after Dr. Asante allegedly informed the Dean of the EEOC charge, as a "decent conversation."  Dean Herbst offered constructive criticism about the weaknesses in the plaintiff's file and advised the plaintiff to strengthen her application and apply for full professorship at a later time.  The plaintiff

---

of dismissal, which did not give any details about the substance of the charge.

testified that she did not feel singled out by the Dean's remarks. In fact, the Dean routinely met with candidates for promotion and in two other meetings in the summer of 2003, including one with the chair of the plaintiff's department, recommended postponement of the promotion process until the candidates' files were strengthened. This narrative does not suggest any "animus" or "antagonism" toward the plaintiff by the Dean. See Marra, --F.3d--, 2007 WL 2215603 at *10.

Nor does the Dean's subsequent role in the promotion process indicate ill will toward the plaintiff. She told Dr. Norment, whom the plaintiff accused of "professional jealousy" in her deposition, that he should not review the plaintiff's file even though he was the head of the DAAS. Pl. Dep. at 30. (This decision was ultimately reversed by Dr. Mauro, a Vice Provost, and Dr. Norment was permitted to write his (negative) review.) Dean Herbst also did not press her request that Dr. Asante not serve on the Ad Hoc committee, despite the fact that it was "very unusual," as President Adamany testified, for a committee member to have such close ties to an applicant.

Similarly, Dean Herbst's involvement with the College Committee does not suggest that she was animated by a retaliatory motive. The plaintiff disagrees, arguing that the Dean "essentially took over" the College Committee and that her demand that the plaintiff translate her books within ten days

demonstrates her bad faith.  There is no evidence, however, to support this characterization of the Dean's interaction with the College Committee.  Dr. Goldkamp testified that he did not have any substantive discussions with Dean Herbst about the plaintiff's file and that she simply relayed the Committee's requests to the plaintiff.  These actions are consistent with the Dean's role as an "ex officio" member of the Committee, as described in Temple's promotion procedures.  Further, the ten-day demand came not from the Dean but the College Committee itself.[7]

The plaintiff attributes significance to a Committee member's questioning "exactly what the Dean said to [the plaintiff]."  Such an email might be meaningful if, for example, Dean Herbst had put requests to the plaintiff that the Committee had not itself initiated.  But the Dean's email asked the plaintiff to submit materials that the Committee had identified as missing, the same materials that the Committee identified in its letter to the plaintiff several days later.  In fact, the Committee's letter was more demanding than the Dean's email, asking for additional external reviews and that any translation of her books be provided within ten days.[8]

---

[7]     According to Dr. Goldkamp, the Committee is under an obligation to complete its review within a time frame set by the university and the College of Liberal Arts.  Def.'s Br. in Supp. Ex. O at 19-22.

[8]     This request was within the Committee's powers to request additional information from an applicant if it discovers

2) <u>The Dean's Recommendation</u>

The plaintiff also relies on the Dean's recommendation as evidence of causation.  But her review does not, either standing alone or viewed in conjunction with the plaintiff's other evidence, allow an inference of causation to be drawn. Several deficiencies highlighted by Dean Herbst -- the lack of information about publishers, the absence of scholarly reviews, and the lack of an external assessment evaluating rigorously the plaintiff's contribution to her discipline -- were also cited by College Committee.  The Dean also cited the lack of peer-reviewed publications as an inadequacy in the plaintiff's scholarship. These explanations for her recommendation are consistent with the weaknesses that she highlighted in her meeting with the plaintiff one year prior.

These explanations are also consistent with subsequent recommendations by the Council of Deans, Dr. Norment, the Advisory Committee, Provost Schwartz, and President Adamany, none of whom knew about the plaintiff's EEOC charge.  These reviewers,

---

gaps in his or her file.  Notably, the Committee did not merely demand French translations of the plaintiff's works but also "scholarly feedback."  In other words, as the Committee stated in its review, the problem with the plaintiff's application was not that she did not provide translations of her French books <u>per se</u>. Instead, it was that the Committee had no way to evaluate their quality, either by reading the works themselves or assessments by others.  The plaintiff admitted in her deposition that she did not provide anyone at the university reviews of her French books. Pl. Dep. at 215.  Without translations, therefore, it is not clear how she thought the quality of her books could be assessed.

as Dean Herbst did, noted the plaintiff's lack of peer-reviewed publications, her tendency to write for publications for which she was on the editorial board, and the difficulty in assessing the impact of her scholarship.  These criteria are explicitly enumerated in Temple's written procedures, which stress the importance of refereed publications and state that scholarship should be evaluated according to site of publication, external reviews (including book reviews), and quality evaluations made by peers.

The Dean's review does contain personal comments about the plaintiff (calling her, for example, a "chronic destructive force").  The Dean's alleged bases for these comments were the plaintiff's personnel file, conversations with the DAAS chair, her own interactions with the plaintiff, and an article about Temple and the DAAS published in the Encyclopedia of Black Studies.  The plaintiff has not produced her personnel file, the Encyclopedia article in question, or any other material suggesting that the Dean's purported grounds for her negative conclusions were false.  Without such evidence, there is no basis to conclude that the real reason for the Dean's negative recommendation was the EEOC charge.[9]

_____

[9]     From the excerpts that appear in the record, the sources cited by the Dean appear to support at least some of her comments.  Dr. Norment's recommendation alleged that the plaintiff works against "virtually any and all" efforts undertaken by the department.  His review also cited the

25

In short, the plaintiff has not provided any evidence that the denial of her application for promotion was temporally linked to her EEOC charge, that she was treated with animosity or antagonism by decisionmakers or treated differently from any other professor applying for promotion, or that the individual recommendations on her application were inconsistent with each other or Temple's written guidelines.[10]  Absent such evidence, and without any evidence that the promotion process was marked by any procedural irregularities, an inference of a causal connection between the plaintiff's EEOC charge and the Dean's recommendation cannot be drawn.

Such a conclusion is consistent with caselaw.  In Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997), the

---

Encyclopedia article, calling it "egregiously inaccurate."  The portions of the plaintiff's personnel file produced by the defendant include multiple complaints, including: a 1997 letter noting the plaintiff's poor teaching in the defendant's Intellectual Heritage program; a 1998 letter from Dr. Joyce relaying the letters of several students who could not get the plaintiff to address their problems; a 2000 letter from Dr. Joyce noting the plaintiff's failure to submit teaching evaluations for Spring 2000; and the 2002 letter from Acting Dean Vogel, the subject of the plaintiff's EEOC charge, reprimanding her for insubordination and warning that similar behavior may result in disciplinary action, including termination.  Def.'s Br. in Supp. Ex. B, Exs. 1, 2, 3, 14.

[10]     In fact, the only potential deviation from Temple's procedures may have been made by the Ad Hoc committee, where the plaintiff received her sole positive recommendation.  Dr. Asante believed erroneously that the plaintiff's entire oeuvre, as opposed to her work since her last promotion, was to be considered by the committee in making its recommendation.

employer appealed a jury verdict for an African-American employee on his retaliation claim, arguing that the evidence was insufficient for a jury to find causation.  There were several pieces of evidence of causation, according to the Court of Appeals.  First, the employer had "set the plaintiff up to fail" by putting him in charge of the worst-performing division and giving him insufficient resources to succeed.  Second, when he was given the job, a manager suggested that he drop his administrative complaints.  Third, the review process, which was devised by the manager who suggested that he drop his complaints, was a "sham": two of the reviewers said that they were not familiar with the plaintiff's past performance or his personnel file.  Finally, the employer had been slow to remove racist grafitti.  The Court of Appeals found the question "very close" but said that the evidence was sufficient for a reasonable jury to infer causation.  Id. at 921-924.

In contrast to the employee in Woodson, the plaintiff has not offered evidence of differential treatment, a desire by her employer to deter protected activity, a "sham" review process, or a hostile work environment.  The only disputed fact is whether Dean Herbst knew about the EEOC charge, and this is insufficient by itself to raise an inference of causation. Because there is no evidence to suggest that the Dean's recommendation was caused by the EEOC charge, the plaintiff

cannot show that the President's ultimate denial of her application was causally related to her protected activity and therefore she has failed to make out a prima facie case of retaliation.

    B.  Pretext

        Even if the plaintiff could make out a prima facie case of retaliation, her claims would still fail.  She concedes that the defendant has stated a legitimate, non-discriminatory reason for its employment decision.  Pl.'s Br. in Opp. at 17.  According to the McDonnell Douglas framework, it is the plaintiff's burden to show that this explanation was pretextual.

        Pretext may be shown by exposing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its actions that a reasonable factfinder could find them unworthy of credence.  Marra v. Philadelphia Housing Authority, --F.3d--, 2007 WL 2215603 at *14 (3d Cir. 2007).  Allegations of pretext will fail if the evidence shows only "a denial of promotion as a result of a dispute over qualifications."  Molthan v. Temple University, 778 F.2d 955 (3d Cir. 1985).  Courts may not "substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure."  Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d

509, 527 (3d Cir. 1993)(citations omitted).

As explained above, the plaintiff has not provided any evidence that the multiple reasons cited in her recommendations were inconsistent, implausible, incoherent, or contradictory. She has not pointed to any deviation from established procedures or misapplication of written standards. Cf. Roebuck v. Drexel University, 852 F.2d 715 (3d Cir. 1988)(evidence of pretext "razor thin" but sufficient where standards applied to the plaintiff were not articulated in any document or applied to any other professor); Bennun v. Rutgers State University, 941 F.2d 154, 179 (3d Cir. 1991)(sufficient evidence of pretext where the articulated factors for the university's decision were "undermined by its inconsistency in applying them").[11]

---

[11]    Even if the plaintiff had produced evidence that Dean Herbst's stated reasons for her recommendation were pretextual, she would still need to show that the Dean's retaliatory recommendation was a "determinative" factor or a "but-for" cause in the denial of her application for promotion. Woodson, 109 F.3d at 932; Watson v. SEPTA, 207 F.3d 207, 222 (3d Cir. 2000). The plaintiff's support for this proposition consists of mischaracterizations of deposition testimony. She argues, without quotation, that Provost Schwartz conceded that promotion was "practically impossible" in light of the Dean's recommendation and that President Adamany testified that the recommendation was a "death knell" for the plaintiff's candidacy.

To the contrary, however, both men stated that they conducted independent reviews, and the President testified that Dean Herbst's letter was "in no way determinative."  Further, Dean Herbst's personal comments about the plaintiff were given in her evaluation of the plaintiff's service to the university, but neither the Council of Deans, the Provost, nor the President evaluated her service, instead resting their recommendations on an inability to assess her scholarship.

Without evidence that the promotion process was marred by procedural oddities, inconsistent standards, or shifting explanations, the plaintiff essentially asks the Court to review the wisdom of the university's promotion decision.  Because this is beyond the scope of a retaliation claim under Title VII or the PHRA, the defendant's motion will be granted.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


MARIE-JOSEE CEROL              :
          Plaintiff,           :    CIVIL ACTION
                               :
     v.                        :
                               :
TEMPLE UNIVERSITY OF THE       :
COMMONWEALTH SYSTEM OF HIGHER  :
EDUCATION,                     :
          Defendant            :    NO. 06-213


<u>ORDER</u>

AND NOW, this 16th day of August, 2007, upon consideration of the defendant's motion for summary judgment (Docket No. 19), the plaintiff's opposition, and the defendant's reply, and after oral argument on the motion held on August 8, 2007, IT IS HEREBY ORDERED that the motion is granted for the reasons stated in the accompanying memorandum.

Judgment is entered in favor of the defendant and against the plaintiff.  This case is closed.



BY THE COURT:



<u>/s/ Mary A. McLaughlin</u>
MARY A. McLAUGHLIN, J.